IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 14-88-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| LESTER PINEX III, | |
| Defendant. | |

Defendant Lester Pinex III is charged with Felon in Possession of a Firearm. Pinex has moved to suppress evidence found after the search of a rental car that he was driving. On August 21, 2015, the Court held an evidentiary hearing. The Court heard testimony from Ranika Smith, Suma Akella, Azhar Nizar, Bob Nizar, former Miles City Police Department K-9 Officer Ryan Ketchum, former Rosebud County Detention Officer Callie Clark, Montana Division of Criminal Investigation Special Agent Jeff Faycosh, Rosebud County Undersheriff Allen Fulton, and Rosebud County Sergeant Bruce Price. After reviewing the evidence and arguments presented by the parties, the Court denies Pinex's motion.

## I. Background

Around 4:45 p.m. on August 21, 2013, Rosebud County Undersheriff Allen Fulton was driving in his patrol car on Interstate 94 near Forsyth, Montana. Law

enforcement considers I-94 to be a drug corridor because it is one of the quickest and most direct routes from the West Coast, which is a common source of supply for drugs, to the Midwest. Undersheriff Fulton observed a white sedan traveling eastbound at 92 mph. The car matched a complainant's recent description of a vehicle traveling east on I-94 at 100 mph and cutting people off while going in and out of traffic.

Undersheriff Fulton crossed the median and activated his lights behind the white sedan. The vehicle pulled over on the left side of the road. After the vehicle stopped, the driver, later identified as Pinex, put his hands in the air. Undersheriff Fulton testified that it is unusual for a driver to immediately put his hands up without any prompting during a traffic stop. Undersheriff Fulton also observed a male in the front passenger seat, who was later identified as Deangelo Tyler.

Undersheriff Fulton exited his patrol car and asked Pinex to move his car over to the right side of the interstate. Pinex complied and repositioned the vehicle near an on ramp that is approximately one mile from Forsyth. While Undersheriff Fulton parked his patrol car behind Pinex, dispatch relayed that the vehicle was registered to a Richard Knight out of University Place, Washington. Rosebud County Sergeant Bruce Price arrived in his patrol car around the same time.

About three minutes after he initiated the traffic stop, Undersheriff Fulton approached Pinex's window and asked for his driver's license, registration, and

insurance. Pinex responded that he did not have a driver's license and that the vehicle was a rental car. Undersheriff Fulton asked Pinex for his name and the rental agreement. Pinex falsely identified himself as Lester Johnson. Pinex also supplied a social security number, a date of birth, and an address in Lakewood, Washington.

Undersheriff Fulton returned to his patrol car and reviewed the rental paperwork with Sergeant Price. The rental agreement was between Ranika Smith from Everett, Washington and Rent-A-Wreck in Lakewood. Ranika Smith was not in the vehicle. The car was rented on August 20, 2013, and was due back on August 24, 2013. The rental agreement did not mention other authorized drivers and allowed only 1,000 miles of use. Undersheriff Fulton recognized that their location was almost 1,000 miles from Lakewood. After reading the rental agreement, Undersheriff Fulton noted to Sergeant Price that "this stinks to high hell." Undersheriff Fulton also relayed the false name, the social security number, and address supplied by Pinex to dispatch. Dispatch was unable to find any information on a Lester Johnson with the social security number and date of birth given by Pinex.

Around 11 minutes from the stop's initiation, Undersheriff Fulton and Sergeant Price exited Undersheriff Fulton's patrol car to get more information from Pinex and Tyler. Undersheriff Fulton asked Pinex to follow him to the patrol

car, while Sergeant Price took Tyler to the front of the rental car. When Tyler

exited the vehicle, he discretely dropped a wallet and tried to kick it under the car.

Sergeant Price did not notice the wallet at that time.

Pinex and Tyler were not handcuffed. When they reached the patrol car,

Pinex started to put his hands on the hood as if preparing to be frisked.

Undersheriff Fulton told Pinex that he did not have to do that. Pinex stated that

police terrify him. Undersheriff Fulton responded that "in Montana, we're not that

bad." Undersheriff Fulton started to ask Pinex a question, and Pinex raised his

hands in the air. Undersheriff Fulton told Pinex to put his hands down, as he was

making Undersheriff Fulton "damn nervous." Pinex replied that he was also

nervous.

Undersheriff Fulton asked Pinex who rented the car. Pinex responded that

Ranika Smith rented the car, and that she was Tyler's girlfriend. Pinex claimed

that Smith was flying to where he and Tyler were driving. Pinex said that on the

next day, Smith and Tyler would drive back to Washington while Pinex remained

at their destination. Undersheriff Fulton asked why they were traveling and where

they were going. Pinex explained that Tyler was his stepbrother, and that Tyler's

father (Pinex's stepfather) had a heart attack. Pinex claimed that his mother and

stepfather live in "Dakota," and that he was going to stay with his mother while

Tyler and Smith returned to Washington.

Undersheriff Fulton told Pinex that he was going to issue a citation for speeding and driving without a license. When Pinex asked if he was going to jail, Undersheriff Fulton responded that he could post a bond for around $175. Pinex replied that he did not have that much money. Undersheriff Fulton asked Pinex if he and Tyler slept anywhere on their drive from Washington. Pinex responded that they slept at a rest area. Undersheriff Fulton instructed Pinex to sit in the rental car while he waited for Sergeant Price to finish his conversation with Tyler.

Sergeant Price had been questioning Tyler while Undersheriff Fulton was with Pinex. Sergeant Price started by frisking Tyler. Tyler explained to Sergeant Price that he just found out that morning that his father was in the emergency room, and he was driving with his stepbrother to visit him. Tyler also claimed to be in the Navy. Sergeant Price, who had previously served in the military, asked if Tyler had his Navy papers. Tyler said that he did not have them with him. Tyler also did not know where he was stationed.

Tyler's stated reason for travel was similar to Pinex's. Tyler claimed that his father and stepmother lived in North Dakota, and his father recently went to the hospital. While Pinex said his stepfather had a heart attack, Tyler said he did not know why his father was admitted to the hospital. Tyler explained that he got a call from his stepmother that she was going to the hospital, and "so this morning was like boom, we gotta go." Tyler said that Ranika Smith was his girlfriend and

that she rented the vehicle the previous day. Tyler also said Pinex was his stepbrother, but Tyler could not recall Pinex's last name.

Sergeant Price asked Tyler about his military service. Sergeant Price asked again whether Tyler had his emergency leave paperwork with him. Tyler said that he did not and agreed with Sergeant Price that such paperwork should be with him at all times. Tyler said he did not have his military identification with him and could not identify his commanding officers.

Sergeant Price questioned Tyler more about why his girlfriend rented the car but was not with him. Tyler said that Smith "had the money" and flew to North Dakota the previous day to see his father. Sergeant Price asked if Smith had given him updates on his father's condition. Tyler said that he had not recently spoken with Smith. Instead, Tyler said he "was just about to call" prior to the traffic stop. Tyler explained that despite having a phone charger in the vehicle, his phone's battery was dead.

Sergeant Price asked if Tyler had a driver's license, and Tyler said that he did out of Illinois. Sergeant Price asked Tyler for his social security number, which Tyler struggled to recall. Sergeant Price noted that, "If you're in the military, everything's by social security. You should know that." Tyler eventually gave a social security number.

Sergeant Price asked Tyler more about his relationship to Pinex. Tyler said that his father told him about a year ago that he had a stepbrother. Tyler initially said that he met Pinex for the first time a couple of weeks prior. A short time later Tyler said that he met Pinex about a year ago. Tyler claimed that Pinex was in Seattle visiting when Tyler picked him up to drive to North Dakota. Sergeant Price asked about whether they stopped to rest along the way. Tyler said that about two or three hours ago they parked by an apartment complex to take a quick nap.

After about 11 minutes of questioning and about 21 minutes into the stop, Sergeant Price told Tyler to remain by the car while he went to talk with Undersheriff Fulton. While Undersheriff Fulton and Sergeant Price walked back to the patrol car, Sergeant Price observed the wallet underneath the rental car's passenger door. Undersheriff Fulton and Sergeant Price got back into the patrol car and exchanged information. They noted the unlikelihood of Pinex's and Tyler's stories. Sergeant Price observed that it was unusual that Tyler claimed to be in the military, yet he did not have any identification, emergency leave papers, did not know where he was stationed, and did not know his chain of command. Undersheriff Fulton and Sergeant Price also discussed some of the discrepancies in their stories. These discrepancies included where they stopped to rest and how

well they knew each other.[1]  Sergeant Price observed that it was getting "stinkier all the time."  Undersheriff Fulton called Tyler's name and date of birth into dispatch for a records check.

Around 24 minutes into the stop, Undersheriff Fulton called Montana Division of Criminal Investigation Special Agent Jeff Faycosh to request a drug dog.  The closest drug dog was in Miles City, which is 45 miles away from Forsyth.  Agent Faycosh supervises the Eastern Montana Drug Task Force and authorizes the deployment of drug dogs.  Undersheriff Fulton explained that he pulled over a rental car occupied by two men from Washington and that "their stories are just total bullshit."  Undersheriff Fulton relayed the information to Agent Faycosh and said they were still working on picking their stories apart.  Undersheriff Fulton's call with Faycosh lasted about four minutes.  Agent Faycosh did not authorize a drug dog's deployment at that time.  During the phone call, dispatch told Undersheriff Fulton that no information came back on Tyler.

While Undersheriff Fulton was talking to Faycosh, Sergeant Price observed Tyler bend over and grab his chest while standing in front of the rental car.  Sergeant Price asked Tyler to come to the rear of the rental car and asked if he was all right.  Tyler said he had a heart condition, but that he did not need an

---

[1] Undersheriff Fulton told Sergeant Price that Pinex said his mother was in the hospital.  Pinex actually told Undersheriff Fulton that his stepfather was hospitalized with a heart attack.

ambulance. Tyler appeared nervous, and Sergeant Price believed that Tyler was having an anxiety attack.

After Undersheriff Fulton ended his call with Agent Faycosh, Sergeant Price told Undersheriff Fulton that he asked Tyler to stay at the back of the rental car because he "didn't know if his buddy was going to ambush us or something." Undersheriff Fulton responded, "Yeah, no shit." Undersheriff Fulton told Sergeant Price that Agent Faycosh was going to check into sending a dog, and that he was going to call Rent-A-Wreck.

Around 31 minutes after the stop's initiation, Undersheriff Fulton called Rent-A-Wreck. Undersheriff Fulton explained that he stopped one of their rental cars for a traffic violation and the males in the car were not on the rental agreement. Rent-A-Wreck asked Undersheriff Fulton to hold the vehicle until they contacted Smith and determined why she was not with the vehicle she rented. Rent-A-Wreck promised to call back soon. The call lasted about four minutes.

After Undersheriff Fulton ended the call with Rent-A-Wreck, he and Sergeant Price retrieved the wallet under the rental car's passenger door. Pinex said it was his wallet and that he must have dropped it. Undersheriff Fulton opened the wallet and saw a concealed weapon permit that was issued to somebody else. Pinex said that the permit belonged to his uncle. Smith's debit card was also in the wallet.

Undersheriff Fulton and Sergeant Price returned to the patrol car and reviewed the wallet's contents. Undersheriff Fulton relayed the permit's information to dispatch. Shortly after, dispatch told Undersheriff Fulton that the permit was active and was issued to a male in Gary, Indiana. Undersheriff Fulton and Sergeant Price remained in the patrol car and discussed the situation.

Around 43 minutes into the stop, Rent-A-Wreck called Undersheriff Fulton back and informed him that Smith had recently been admitted to a Seattle-area hospital with kidney stones.[2] Rent-A-Wreck requested that Undersheriff Fulton seize the car and consented to the car's search. Undersheriff Fulton also obtained Smith's phone number. This call lasted around three minutes.

Undersheriff Fulton and Sergeant Price discussed the new information that Smith was in a hospital in Washington and did not fly to North Dakota as claimed by Pinex and Tyler. Undersheriff Fulton said they "definitely need to get in this vehicle." Sergeant Price recommended that they have a drug dog show up to sniff the bags as they were removed from the vehicle.

Undersheriff Fulton called Agent Faycosh again. Undersheriff Fulton updated Agent Faycosh about Smith's presence in Washington and Rent-A-Wreck's consent to search the vehicle. Undersheriff Fulton agreed with Agent Faycosh to ask Pinex and Tyler for consent to search their belongings.

---

[2] Smith actually was admitted due to gall stones.

Around 49 minutes into the stop, Undersheriff Fulton directed Sergeant Price to call a wrecker to impound the rental vehicle. The nearest tow truck was located in Hysham, which was approximately 25 miles from their location. Undersheriff Fulton spoke with Rent-A-Wreck again and gave the address for the impound lot in Forsyth. Undersheriff Fulton also requested that Rent-A-Wreck fax a request to hold the vehicle to the Rosebud County Sheriff's Office.

Around 55 minutes into the stop, Undersheriff Fulton and Sergeant Price approached Pinex and Tyler and requested consent to search the vehicle. They both declined a search. Undersheriff Fulton said that was all right and that he still needed to find somebody with a driver's license to drive the car. Undersheriff Fulton told Pinex that he had not yet begun writing the ticket for speeding and driving without a license.

Undersheriff Fulton questioned Tyler again about Smith. Undersheriff Fulton asked if Smith was already in North Dakota. Tyler said yes, that she flew out the day before and that he spoke with her that morning. Undersheriff Fulton again told Pinex and Tyler that he could not let the vehicle leave without a licensed driver. Undersheriff Fulton also said that he needed to write tickets for Pinex. Pinex and Tyler did not know that a tow truck was in route, and they apparently believed they were simply being issued traffic tickets.

Around one hour into the stop, Undersheriff Fulton and Sergeant Price re-entered the patrol vehicle. Undersheriff Fulton told Sergeant Price that he was "just buying time." Sergeant Price responded, "Oh yeah." Undersheriff Fulton and Sergeant Price again discussed having a dog sniff items as they removed them from the vehicle. An hour and seven minutes into the stop, Undersheriff Fulton told Sergeant Price that he was "kind of writing slow because I would think [the wrecker driver] would be here by the time I'm done writing."

Undersheriff Fulton and Sergeant Price continued talking about the implausible aspects of Pinex's and Tyler's stories. Undersheriff Fulton mused, "What do you think's going to happen when we tell them we're impounding their vehicle?" Sergeant Price added, "Or the friggin' dog shows up." Undersheriff Fulton explained that they were going to tow the vehicle to Forsyth and conduct the canine sniff at the office.

Around one hour and 11 minutes into the stop, Agent Faycosh called Undersheriff Fulton. Undersheriff Fulton updated Agent Faycosh. Undersheriff Fulton explained to Agent Faycosh that all they currently had on Pinex was driving without a license and speeding. Undersheriff Fulton noted that driving without a license can carry jail time, but he previously told Pinex that it was just a fine. Undersheriff Fulton and Agent Faycosh agreed to impound the car and obtain a

12

search warrant for any containers found inside the vehicle. The call lasted around four minutes.

For the next six minutes, Undersheriff Fulton and Sergeant Price shot the breeze while they waited for the wrecker to arrive. Approximately an hour and 29 minutes into the stop, Undersheriff Fulton called Judge Bush in Forsyth to see if he wanted Pinex and Tyler to appear in court or to just let them leave. Judge Bush did not answer, and Undersheriff Fulton left a voicemail. While Undersheriff Fulton was on the phone, the wrecker arrived.

The wrecker arrived around one hour and thirty minutes into the stop. Pinex and Tyler were surprised and confused. Undersheriff Fulton explained that Rent-A-Wreck requested that they seize the vehicle. Pinex asked if he could take his belongings out of the car. Undersheriff Fulton said they could remove their bags once they arrived at the office in Forsyth.

Judge Bush called Undersheriff Fulton back. Undersheriff Fulton explained to Judge Bush that he had an out of state driver without a license and asked Judge Bush if he wanted Pinex to appear, to let him go, or require bond before he goes. They agreed that Pinex should appear in court.

After discussing possible alternative modes of transportation out of Forsyth, Pinex again expressed concern about his belongings: "Can I take – I just need my stuff. Y'all can take the car." Undersheriff Fulton responded that they would "do

all that at the office. I just don't want to deal with it out here on the road." Tyler asked if they could take their belongings and leave once in Forsyth. Undersheriff Fulton said yes, they could leave once they confirmed identifications "and stuff like that." Pinex asked if he could at least get his phone from the rental car. Undersheriff Fulton said no. Pinex again pleaded for his belongings, saying, "I just want my stuff. If y'all taking the car and you took my – and they took our money – I just need my stuff; it's in the trunk. Y'all got to take the car. My phone and my clothes and my -." Undersheriff Fulton responded, "Like I said, once we get down to the office we will turn them – we'll turn them over."

Undersheriff Fulton told Pinex and Tyler to wait in the back seat of the patrol car. Pinex and Tyler complied. Once alone in the patrol car, the dashboard camera recorded Pinex and Tyler discussing "dope" hidden in a lockbox and a "thumper" in Pinex's bag. Law enforcement did not hear this conversation until they reviewed the video that evening.

Around an hour and 40 minutes into the stop, the wrecker finished loading the rental car. Undersheriff Fulton drove Pinex and Tyler to the Sheriff's Office. They arrived around five minutes later, and Bakki the drug dog was waiting for them. Pinex asked, "When can we get our clothes and stuff?" Undersheriff Fulton responded that they had to unload the car first. Undersheriff Fulton left Pinex and

Tyler in the patrol car and placed Rosebud County Detention Officer Callie Clark in charge of watching them.

Shortly after, around an hour and 49 minutes into the stop, Pinex asked Officer Clark if he could get out of the patrol car. Officer Clark said no. Pinex responded, "But if we're not under arrest, why we got to sit in this car?" Officer Clark responded, "Because that's what he wants." Tyler noted that he was "being held against [his] will."

Around an hour and 54 minutes into the stop, Miles City Police Department K-9 Officer Ryan Ketchum used Bakki to sniff the rental car. Bakki alerted near the rear driver side tail light. Around an hour and 58 minutes into the stop, Undersheriff Fulton told Pinex he was under arrest for driving without a license.

Pinex was booked and fingerprinted. A records check based on his fingerprints revealed his true identity as Lester Pinex III, not Lester Johnson as he previously maintained. The records check also revealed an "active local want" for Pinex. A search warrant was obtained for the vehicle and its contents. The subsequent search revealed drug paraphernalia, heroin, and a handgun. The handgun was found in a red suitcase. The vehicle was eventually returned to Rent-A-Wreck. Pinex faced drug charges in state court and received a 5 year sentence. The grand jury subsequently indicted Pinex for Felon in Possession of a Firearm.

Smith testified at the hearing about the circumstances of renting the car from Rent-A-Wreck. Smith said that she rented the car specifically for Pinex. Smith testified that she gave Pinex permission to use the rental car without any limitation, and she believed Pinex was traveling to Chicago to visit his children.

## II. Analysis

Pinex moves to suppress incriminating evidence found after the canine sniff. As a threshold matter, the government argues that Pinex does not have standing to challenge the search of the rental car. The Court will address the standing issue before analyzing whether the prolonged stop violated the Fourth Amendment.

### A. Standing

The government argues that Pinex does not have standing to challenge the search. When the government wrote its response brief, it believed that Smith did not give permission for Pinex and Tyler to take the car. However, at the hearing Smith specifically testified that she granted permission for Pinex to drive the rental car without any geographic limitations. An unauthorized driver of a rental car "has standing to challenge the search of a rental automobile if he received permission to use the rental car from the authorized renter." *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006). Since Pinex received permission from Smith to use the rental car, he has standing to challenge the search.

16

## B. The Stop

Pinex argues that Undersheriff Fulton and Sergeant Price impermissibly prolonged the stop in order for the drug dog to arrive. The government counters that Undersheriff Fulton and Sergeant Price continued to develop reasonable suspicion during the stop and acted diligently to confirm or deny that suspicion. The Court agrees with the government and finds that law enforcement complied with the Fourth Amendment.

The Fourth Amendment prohibits unreasonable searches and seizures. A traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Similar to a *Terry* stop, only reasonable suspicion that a crime has occurred is required to conduct an investigatory traffic stop. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The standard is "not a particularly high threshold to reach." *United States v. Valdes-Vegas*, 738 F.3d 1074, 1078 (9th Cir. 2013).

A traffic stop may be extended where unfolding evidence supports a suspicion of criminal activity. *United States v. Rodgers*, 656 F.3d 1023, 1027 (9th

Cir. 2011). "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). In determining whether a traffic stop was impermissibly extended, courts consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

While the duration of the stop bears on the analysis, "there is no strict time limit." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005). Rather, as "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006), "a fact-specific reasonableness inquiry is appropriate for Fourth Amendment questions," *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008). The Court must examine the "totality of the circumstances" surrounding the stop to determine if the prolonged detention was unreasonable. *Id.*

Law enforcement cannot prolong a traffic stop to allow a canine sniff "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). If a stop is extended to allow a canine sniff, the officer must have "independent reasonable

18

suspicion to support such a prolongation." *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015). "Of course, if the driver obstructs the police officer's efforts in any way—for example, by providing inaccurate information—a longer traffic stop would not be unreasonable." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).

Here, the Court finds that Undersheriff Fulton and Sergeant Price did not unreasonably prolong the traffic stop. Instead, they developed reasonable suspicion that a crime could be in progress given the implausible stories and suspicious circumstances. Undersheriff Fulton had reasonable suspicion that Pinex was committing a traffic violation (speeding) when he initiated the stop. Undersheriff Fulton permissibly asked for Pinex's identification, the car's registration and proof of insurance. *Evans*, 786 F.3d at 786.

Pinex's responses piqued Undersheriff Fulton's suspicion that Pinex and Tyler were engaging in other criminal activity. Pinex was driving without a driver's license. The car was a rental, and the authorized driver was not in the car. *See United States v. Winters*, 782 F.3d 289, 300 (6th Cir. 2015) ("We have stressed that drug couriers may commonly drive other people's rental cars, using so called 'third-party rentals'") (internal quotation and brackets omitted). In addition, Pinex was travelling on I-94, which law enforcement considers a drug corridor. *See United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994), *abrogated on other*

*grounds in Muehler v. Mena*, 544 U.S. 93 (2005), (finding reasonable suspicion because, in part, the defendant was "travelling to Salt Lake City, a known 'drug hub'"). The rental agreement further provided that the car was rented from Lakewood, Washington, and the car was rented on August 20, 2013, and was due back on August 24, 2013. Such a quick turnaround is indicative of drug trafficking. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989). These articulable facts supported Undersheriff Fulton's suspicion that Pinex was involved in drug trafficking.[3] Or as Undersheriff Fulton put it, "This stinks to high hell."

Undersheriff Fulton and Sergeant Price developed more articulable facts to justify the prolonged detention when they questioned Pinex and Tyler. Pinex and Tyler provided implausible explanations for their travel. *See United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009) ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion") (internal quotation omitted). Pinex explained that his stepfather (and Tyler's father) was hospitalized in North Dakota. Pinex and Tyler claimed that Smith rented a car for them the previous day, but she flew to North Dakota the previous night. The Court agrees with Undersheriff Fulton and Sergeant Price's assessment that it is odd that Tyler's girlfriend would fly to see Tyler's father in the hospital while Tyler would

---

[3] The government claims that Pinex acted suspiciously when he raised his hands in the air unprompted. While potentially odd behavior, the Court does not find that this reaction reasonably supported a suspicion of criminal activity.

20

take the much longer mode of transportation. Further, Pinex claimed that Tyler would only stay one night before driving back with Smith. Undersheriff Fulton and Sergeant Price reasonably believed that it would be odd to drive all the way from Washington to North Dakota to visit your hospitalized father, only to return to Washington the next day. Also, Tyler curiously did not call for any updates on his father's health, despite having a cell phone and a charger.

Pinex and Tyler also provided contradicting information. Pinex claimed that they stopped to nap at a rest area, while Tyler said they napped outside of an apartment complex. Pinex said that his stepfather had a heart attack, but Tyler could not identify his father's ailment. Tyler said Pinex was his stepbrother, but he could not remember Pinex's last name.

Tyler also provided implausible information about his background. He claimed to be in the Navy. However, Tyler did not have emergency leave paperwork or military identification, did not know where he was stationed, and did not know his chain of command. Tyler also struggled to recall his social security number. Sergeant Price previously served in the military and recognized that a person in the military should always carry leave paperwork and his military identification. Further, Sergeant Price knew that a military member would know where he was stationed, be able to identify his commanding officers, and be able to quickly recall his social security number.

The Court finds that Undersheriff Fulton and Sergeant Price acted diligently to confirm or deny these suspicions. Upon returning to the patrol car, Undersheriff Fulton called Agent Faycosh to request a drug dog and seek advice. Given that Undersheriff Fulton had articulable facts that Pinex and Tyler were trafficking drugs, it was reasonable to call the supervisor of the Eastern Montana Drug Task Force and request a drug dog. *See United States v. McDuffie*, 2015 WL 164786, at *6 (D. Mont. Jan. 13, 2015). After speaking with Agent Faycosh, Undersheriff Fulton called Rent-A-Wreck in an attempt to determine the status of the rental car. Rent-A-Wreck determined that Smith had in fact been hospitalized herself in Washington. Smith had never flown to North Dakota as claimed by Pinex and Tyler. This lie furthered Undersheriff Fulton and Sergeant Price's suspicion that criminal activity was afoot.

Pinex's and Tyler's own deception extended the amount of time needed to effectuate the stop. Pinex did not give Undersheriff Fulton his correct name. This lie impeded the investigation and delayed Undersheriff Fulton's attempt to identify him. Similarly, Tyler impeded the investigation by kicking the wallet under the car. This confused Undersheriff Fulton and Sergeant Price and forced them to spend time investigating the wallet's contents.

Around 24 minutes into the stop, Undersheriff Fulton asked Agent Faycosh to send a drug dog to Forsyth. By the time Undersheriff Fulton made that request,

he had reasonable suspicion that Pinex and Tyler were trafficking drugs. Undersheriff Fulton directed Sergeant Price to call the wrecker around 50 minutes into the stop. This was soon after Rent-A-Wreck requested that Undersheriff Fulton seize the car.

The Court acknowledges that the stop had a long duration. Taken in isolation, Undersheriff Fulton's comments approximately an hour into the stop that he was "just buying time" and that he was "kind of writing slow" appear to show that he was not working diligently to confirm or dispel his suspicions. However, by that point, Undersheriff Fulton had already called for a drug dog and a wrecker. Undersheriff Fulton did not want to let Pinex and Tyler know that he was seizing the car. Undersheriff Fulton wanted Pinex and Tyler to remain relaxed until the wrecker actually got there.

Any delay following Undersheriff Fulton's request for a drug dog or a wrecker is a result of their relative geographic isolation. The nearest drug dog was located approximately 45 miles away in Miles City. The nearest wrecker was approximately 25 miles away in Hysham. The Court finds that Undersheriff Fulton acted diligently in his investigation. Given the geographic location of the stop, Pinex and Tyler's attempts to deceive Undersheriff Fulton and Sergeant Price, and the facts that continued to develop into the investigation, the Court finds that the stop was not unreasonably prolonged.

Pinex cites to *Rodriguez* and claims that Undersheriff Fulton impermissibly held Pinex until the drug dog could sniff the car. The Court finds that *Rodriguez* is distinguishable. In *Rodriguez*, a police officer pulled over a car after witnessing a traffic violation. 135 S. Ct. at 1612. The police officer obtained the driver's license, registration, and proof of insurance. *Id.* at 1613. The record before the Court was not clear whether the police officer developed articulable facts that the driver was engaged in drug trafficking. *Id.* After giving the driver a written warning for the traffic violation, the police officer asked the driver for permission to walk a drug dog around the vehicle. *Id.* The driver denied permission, and the officer instructed the driver to exit the vehicle and wait for a drug dog's arrival. *Id.* Around eight minutes later, a drug dog arrived and indicated to the presence of drugs in the car. *Id.* The subsequent search revealed a large bag of methamphetamine. *Id.*

The Court held that the police officer impermissibly detained the driver while waiting for the drug dog's arrival. *Id.* at 1616. The Court recognized that ordinary traffic stops entail checking driver's licenses and running records checks. *Id.* at 1615. In contrast, a canine sniff is not an ordinary incident to a traffic stop. *Id.* Therefore, law enforcement cannot prolong a traffic stop just to allow a canine sniff. *Id.* However, reasonable suspicion of additional criminal activity can support detention beyond the completion of the traffic infraction investigation. *Id.*

at 1616-17. The Court remanded the matter to the Eighth Circuit to determine whether the police officer had reasonable suspicion to prolong the traffic stop. *Id.*

On the record before the Court in *Rodriguez*, the officer did not have reasonable suspicion that the defendant was engaged in other criminal behavior. In contrast, Undersheriff Fulton had independent reasonable suspicion to believe that Pinex and Tyler were trafficking drugs. Since Undersheriff Fulton reasonably believed there was criminal activity, he permissibly prolonged the stop while he diligently worked to confirm or dispel those suspicions.

As previously mentioned, the Court must examine the "totality of the circumstances" surrounding the stop to determine if the prolonged detention was unreasonable. *Turvin*, 517 F.3d at 1101. Here, the Court must consider the realities of rural Montana, for example, how far the drug dog must travel to the scene, how far away the wrecker is, etc. These factors necessarily lengthen the duration of the stop; however, it doesn't mean the officers didn't diligently pursue a means of investigation that was likely to confirm or dispel their suspicions quickly. Quickly is a relative term. Here, the officers acted quickly in conducting their investigation given their location.

Undersheriff Fulton and Sergeant Price reasonably prolonged the stop to investigate Pinex and Tyler. Undersheriff Fulton called for a drug dog shortly after developing reasonable suspicion. He asked Sergeant Price to call for a wrecker

25

after Rent-A-Wreck requested it. Any delay beyond that is not the fault of Undersheriff Fulton, but rather the relatively isolated location in eastern Montana where the stop occurred. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Since Undersheriff Fulton and Sergeant Price did not act unreasonably, the prolonged traffic stop did not run afoul of the Fourth Amendment. Individuals engaged in criminal activity should not be allowed to benefit from the sheer fact that they are stopped in rural Montana and, thus, the investigation may take longer due to the lack of nearby resources.[4]

## III. Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Pinex's Motion to Suppress (Doc. 38) is DENIED.

DATED this 4th day of September, 2015.

SUSAN P. WATTERS
United States District Judge

---

[4] Because this Court finds that there was not a violation of the Fourth Amendment, it declines to address the government's argument regarding the application of the inevitable discovery doctrine.